ELIZABETH BONER, Respondent, v. CLARENCE M. NICHOLSON, Appellant.

St. Louis Court of Appeals. Argued and Submitted November 4, 1913.
Opinion Filed December 2, 1913.

PHYSICIANS AND SURGEONS:  Malpractice:  Sufficiency of
    Evidence.  In an action against a surgeon for negligently closing a wound without removing therefrom a piece of gauze, after performing an operation on plaintiff, evidence *held* to establish that defendant gave plaintiff proper treatment, and hence it is *held* that plaintiff was not entitled to recover.
            NORTONI, J., *dissents.*

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

REVERSED.

*Watts, Gentry & Lee* for appellant.

*Collins, Barker & Britton, Casper M. Edwards* and *C. K. Rowland* for respondent.

REYNOLDS, P. J.—Action by plaintiff, respondent here, against appellant, for damages. The petition in the case, after averring that plaintiff's husband had employed defendant, a physician and surgeon, to remove an abscess or tumor from plaintiff's abdomen and attend and care for her thereafter for compensation to be paid therefor, avers that defendant entered upon the employment but failed to use due and proper care or skill in the operation and care of plaintiff in this: "That defendant negligently and with gross negligence, unskillfully and unprofessionally closed the wound made by said operation without first removing therefrom a piece of cloth known as gauze, folded compactly and with a tape attached thereto, said gauze being approximately eight inches square; that by reason of defendant's gross negligence, plaintiff was compelled to undergo numerous operations known as probings, until on or about the 21st day of October, 1909, when said gauze was removed by a final operation." Averring that plaintiff was confined to her room and bed for approximately five months and put to additional expense for physicians, surgeons and medicines in the sum of $800, and caused to suffer great bodily pain and mental anguish, and that she is now and will continue for a great period of time so to suffer, $10,000 are demanded as compensatory and $10,000 as punitive damages, with costs.

The answer was a general denial; the trial before the court and a jury.

At the close of the evidence in the case for plaintiff, defendant interposed a demurrer, which was overruled. Thereafter he introduced his testimony, and all of the evidence being in, defendant again interposed a demurrer, which was overruled and, the court instructing the jury, a verdict was returned in favor of plaintiff in the sum of $1000. Filing a motion for new trial and excepting to that being overruled, defendant duly perfected his appeal to this court.

The learned counsel for appellant make seven assignments of error. First, to the action of the court in overruling the demurrer to the evidence. Second, to the admission of improper evidence. Third, the allowance of improper questions by plaintiff's counsel which suggested that defendant was insured against liability in actions for damages. Fourth, to the overruling of motions made by defendant to discharge the jury and continue the cause because of these improper questions. Fifth, to the exclusion of evidence offered by defendant. Sixth, the making of improper remarks and the asking of improper questions by the trial court. Seventh, the giving of improper instructions by the court at plaintiff's request. In the view we take of the case, it is only necessary to consider the first of these assignments. We hold, on the testimony of plaintiff herself, and on the petition in the case, that the demurrers should have been given. We might rest on plaintiff's own evidence, for her case was in no manner helped out by that of the defendant. In point of fact, the evidence for defendant showed that his treatment of the case while in his hands was highly skillful, and very successful.

First, as to the petition, the negligence charged is "that *defendant* negligently and with gross negligence, unskillfully and unprofessionally *closed* the wound made by said operation, without first removing therefrom" a piece of gauze, etc. We have italicized the words, "defendant" and "closed." They are not only very significant, but controlling. It is not charged that Nature closed the wound; not charged that in the ordinary course of things the wound became closed; it is distinctly and specifically charged that defendant closed the wound, without first removing the gauze from it, and that this was negligence. To paraphrase it, that this sponge was put into the wound when the surgical operation was first performed and that with this sponge in the wound, "defendant negligently and

with gross negligence, unskillfully and unprofessionally closed the wound.'' That is the charge, gathered not only from the petition but from the testimony of plaintiff, and the theory upon which her counsel tried the case.

Turning to the testimony given by plaintiff herself, it appears that, living at Malden, this State, suffering from an abscess or tumor which had formed in her abdomen, her family physician insisted on her going to St. Louis for treatment, that physician recommending that she place herself under the care of defendant, who was at the time chief surgeon of the Rebekah Hospital in St. Louis. Accompanied by her husband and family physican, she went to St. Louis on the 27th of May, 1909, going directly to the hospital, and placed herself in charge of defendant for the operation. She was operated upon the next day, May 28th. Without going into detail, it is sufficient to say that a large gash, six, eight or ten inches long was cut in her abdomen. The operation—designated laparotomy—was performed by defendant, assisted by another surgeon and one or more nurses. During this operation plaintiff was under the influence of an anaesthetic. That, says plaintiff, was the only time while she was at the hospital, that, so far as she knew, she was under the influence of an anaesthetic.

Plaintiff testifies that she knew nothing of the operation itself, as she was unconscious while it was being performed; that she regained consciousness about half past four o'clock on the afternoon of the 28th of May, and found her husband and Dr. Mitchell sitting in the room, with others, possibly, but not defendant. It would seem, from what plaintiff testified to as occurring afterward, that when the operation was performed, the opening was packed with gauze strips or sponges, as they are called, the edges of the cut sewed together and a bandage put around her body to hold the dressing in place. That condition remained until

the ninth day after the operation had been performed. On this ninth day, says plaintiff, and we here follow her testimony, placing in quotation marks portions of it just as she gave it, the bandage was undone and the stitches and packing taken out. She then for the first time saw the wound, which, she says, had not been opened between the day of the operation and this ninth day. When the packing was taken out on this ninth day, the wound was washed out and strips of packing, of gauze—plaintiff indicating the length by her hands —put "up and down the gash." The first time this dressing occurred the gash had come open after the stitches had been removed, and Dr. Axline, the surgeon who acted as assistant to defendant in handling the case, "taken strips of adhesive, the nurse held that together, and Dr. Axline put strips of adhesive over it to keep it from coming further apart," that is, put this adhesive plaster on the outside, and "then he would take strips of gauze with an instrument about that long (indicating) he had, and slip it under that adhesive and fill up that place." The gauze was in long strips, plaintiff indicating the size.

Plaintiff continues: "They would get that just about full, then they would take pieces of gauze doubled backwards and forwards, they put a great pile of that over the place, and then put cotton on and bandaged me up. . . . I was dressed every day while I was there after they taken the stitches out." The treatment continued in the hospital until August 20th. Asked by her counsel whether during that time the wound was getting smaller all the time, she said it was, so that on the 20th of August, "it had very near closed up, only where the drain tube was, they had a drain tube in there." This drain tube apparently emptied through the vagina, "and," says plaintiff, "every morning whenever they would dress that place they would have to draw them drain tubes out; it was very painful." That was done every morning while plain-

tiff was at the hospital, the drain tube not being dispensed with until a week before she left the hospital. In the meantime they continued to dress the wound, which kept getting smaller every day, until, when plaintiff finally left the hospital, as she says, the wound in her abdomen was not larger than the end of her thumb. Plaintiff said that at the last they were not putting any more gauze in the wound—"I don't know how long they hadn't used no gauze, only just enough for covering, just put in a big, wide piece, as wide as your hand." That was put right over the wound, on the outside, next to the flesh. They gradually kept putting in less gauze. Asked up to what time they had quit putting in gauze, plaintiff said: "I don't know how long before I left there, that had healed up only where the tube was; of course they couldn't put no gauze there, only just to lay it over there;" knows they started in on that sort of treatment on the ninth day after she had been in the hospital and that they quit before she went home. Asked if she remembered about when they put the last gauze in the wound, plaintiff said she did not; did not remember about what time between the nine days and before she left the hospital it was that the wound became so small that they could not, or did not, put in any more gauze. Plaintiff said what she did know was, that a week before she left the hospital, the wound was healed up to the size of the end of her thumb. When plaintiff was about to leave the hospital defendant gave her no instructions about herself nor about the wound, nor did he tell her whether or not there was a piece of gauze left in her abdomen; said nothing about her condition one way or the other.

This is practically all of the testimony in chief of the plaintiff touching her treatment in the hospital. As to what occurred afterwards, it is sufficient now to say that when plaintiff reached home about the 21st of August, she again placed herself under the care of her

own physician, Dr. Mitchell. On October 21st, 1909, he found a tape protruding from the opening in the wound and pulling on it brought out a piece of gauze, called a sponge. That ''sponge'' was in evidence and it is described as a piece of gauze, rolled into a cylindrical shape, about six or eight inches long and about an inch and a quarter in diameter, with a tape some four inches long attached to one end. It was rolled up in its present shape to get it out; originally, it is claimed, it was flat but was rolled into its present shape in extracting it.

On cross-examination plaintiff repeated that she first saw the wound when the dressing was removed on the ninth day after the operation had been performed; was lying flat on her back, but by elevating her head slightly and looking along down the line of her body, she could see into her abdomen. The gash was a long one, could see a cavity in the abdomen ''about as big around as the top of a medium size teacup. It didn't look deep when I saw it.'' Asked, ''You couldn't see the bottom of it, could you?'' plaintiff answered, ''I saw my bowels after they taken the packing out.'' This follows: ''Ques. Now, from time to time they dressed it and you didn't attempt to count the sponges they put in or took out? Ans. They never put no sponges in. Ques. Never did? Ans. No, sir; not after they taken the stitches out; they put in long pieces of gauze, longer than my arm, never put no sponges in there. Ques. How could you tell? Ans. I could see whenever they would lay them in there a piece at a time. Ques. Did you attempt to count every piece that they put in every day? Ans. No, I didn't . . . Ques. You left it to the doctors to decide what to put in and what to take out? Ans. They put in and taken out what they wanted to, but didn't take out nary sponge. Ques. How did you know, weren't their arms between your eyes and the opening when they were dressing?

Ans. No, sir; Dr. Axline stood on this side and dressed it (indicating). Ques. Didn't he have his arm between your eyes and the wound? Ans. When he would take up a piece of gauze to put in there he would take it out of the pan that had medicine in it, raise it up long, lay it down there back and forth. Ques. They also put in a drainage tube? Ans. That was done when I didn't know nothing about it; . . . knew it was there. Ques. When they took that (the drainage tube) out, could you not see whether they put anything in place of it. Ans. No, sir; they never put nothing in there when they taken the drainage tube out. Ques. You never did see anybody put in that piece of gauze that finally came out? Ans. No, sir, I didn't; I seen Dr. Mitchell take it out;'' did not see anybody put it in, and does not know who put it in, says plaintiff in answer to questions. To resume: ''Ques. . . . Now when they treated you from time to time, as the treatment progressed, this long cut, eight or ten inches long in the skin, gradually healed, didn't it? Ans. Yes, sir. Ques. You could notice each day it had healed a little bit more than it had the day before? Ans. Some days it looked like it was healing all right; looked to me that way, but the doctor would take an instrument and rip it loose where it had healed at the top, it seemed like he didn't want it to heal up; that is what I thought. Ques. That is what he said, he didn't want it to heal up? Ans. Yes, sir. Ques. And you knew all the time from the course of that treatment what they were trying to accomplish was to prevent the wound from closing on the outside of the abdomen until it had closed on the inside? Ans. Yes, sir. . . . Ques. You saw from the way they were ripping it loose from the outside they were trying to keep it from healing on the outside first? Ans. Yes, sir. Ques. You also saw they were packing stuff inside? Ans.

Yes, sir; just laying it along in the gash, that was all the place they packed.''

Plaintiff repeated that when she left the hospital, the opening in the skin had been reduced to about the size of her thumb and the cut had all healed but that; that the last treatment given her at the hospital was the evening of the 20th of August. On the evening of that day, the assistant to defendant, who was then attending her, ''washed the wound all out good, washed it off good, and put a piece of gauze over it, put new cotton on it, and got adhesive and put a bandage plumb from one side to the other just as tight as he could draw it,'' around her body; used a syringe with liquid in it to clean out the wound, inserting the end of the syringe into the wound to about the depth of half of her litle finger. Continuing, plaintiff was asked: ''Ques. Now you don't know when was the last day that any gauze was put into the wound? Ans. How is that? Ques. You don't know when was the last day that any gauze was put into the wound? Ans. No, sir. Ques. You stated on your direct examination you didn't know when the last time was they put gauze in there? Ans. No, sir; I don't; it had been healed up quite a while before I left the hospital, all only that opening.'' Plaintiff further testified that after she went home she suffered greatly; her physician treated the wound, opened the edges when it closed and ''washed out this place here in my side where the opening was, and he put in his medicine—I don't know what kind of medicine he used, but the treatment was a good deal the same as Dr. Nicholson's.'' The wound was still open and running. That continued, she says, not only until October 21st, but until February 3, 1910. On the 21st of October, 1909, Dr. Mitchell pulled out the piece of gauze offered in evidence and she was greatly relieved, going about her work in about two weeks. The secretion of pus, however, continued, discharges occurring. The wound in the skin had healed

up twice between then and January, but it would break out again and run, meaning by that, as she said, it would come open again. Plaintiff was then asked: How soon after the sponge was taken out was it that the wound healed completely? Ans. Why, it never healed entirely up for I guess eight weeks;'' did not stay healed but a few days and broke open of its own accord, watery looking matter being discharged from it which was very offensive. Dr. Mitchell would take a probe, run it into the wound and burn or cauterize it; that was before he removed the gauze; after the gauze had been removed about eight weeks the skin healed but it broke open again, and Dr. Mitchell again cleansed it and it would heal over again in a few days and remain that way for about a week before it would break open again. Between October and January it healed up and broke open twice, then healed up the third time and a large break, discharging watery matter, occurred. Dr. Mitchell again cauterized it and it gave her no more trouble. It finally healed the 3rd of February.

On redirect examination plaintiff testified that she had never been operated on surgically before the time when defendant operated. There was no wound or cut in her body until the day he operated. Continuing, her counsel asked her: ''Ques. And you saw all the gauze that went into there after that. Ans. Yes, sir. Ques. And such a sponge as this did not go into that wound? Ans. Did not; no, sir.'' Question by the court: ''What is that?'' Mr. Barker, counsel for plaintiff: ''She doesn't know what happened on the date of the operation; she was never operated on before; her wound wasn't opened until nine days afterwards; she saw it opened every time after that and after that no such sponge as this was inserted in that wound.'' By the Court: ''Ques. Did Dr. Mitchell, after you returned to your home, ever take out any gauze prior to this day you speak of? Ans. No, sir;

that is the only piece of gauze taken out. Ques. He never put in any gauze? Ans. No, sir.'' By Mr. Barker: ''Ques. You didn't know this gauze was in there? Ans. No, sir; but I did know when it came out.''

This is substantially all the testimony of plaintiff as to her treatment in the hospital by defendant, and after she went home and was again in the hands of Dr. Mitchell, her local physician. Testimony of nonprofessional witnesses was given as to the extent of her suffering which is not necessary to reproduce.    A physician and surgeon was introduced by plaintiff as an expert, who was asked this hypothetical question: ''Assuming, doctor, that laparotomy has been performed upon a woman, do you consider the leaving of a sponge such as you have described and such as has just been exhibited to you, in the abdominal cavity for a period of say about one hundred and fifty-six days, proper or skillful treatment?'' He answered, ''No.'' Before this hypothetical question for plaintiff finally assumed this form, counsel for defendant objected and excepted to the period being placed at one hundred and fifty-six days, on the ground that defendant was not responsible except for the period while plaintiff was in his care, that is from the 27th of May to the 21st of August, and objected and excepted to the period between the 21st of August and the 21st of October being included, the contention of counsel for defendant being that defendant was responsible, if at all, for only about eighty or eighty-five days, namely, from May 27th to August 21st, and not for one hundred and fifty-six days. On final cross-examination of this same physician a long hypothetical question assuming to cover and, as we find, covering all of the testimony which had been given in the case with reference to the treatment of plaintiff, was put to that same surgeon by counsel for defendant, the conclusion of the question being ''whether in his opinion as a surgeon and expert the treatment de-

scribed for the condition described was proper surgical treatment or not," to which he answered, that it was, and that it was such treatment as is adopted by the leading surgeons of the world.

The family physician, Dr. Mitchell, was not put on the stand or examined as a witness by plaintiff but by defendant, and save the physician first above referred to, no expert witnesses were placed upon the stand by plaintiff.

Referring to the testimony and to the petition, we are forced to the conclusion that plaintiff's own testimony fails to make out her case.   That case must turn in the first place, on plaintiff having established by substantial evidence, that this sponge, removed October 21st, had been put into the wound in May and closed up in the wound by defendant at that time; that defendant had then "negligently and with gross negligence unskillfully and unprofessionally closed the wound made by said operation without first removing therefrom a piece of cloth known as gauze, folded compactly and with a tape attached thereto," known surgically as a sponge.

That was the theory upon which the case was tried by plaintiff. In support of this, it was further sought to show that the particular sponge or piece of gauze had been pushed in or became lodged between the intestines and a fatty apron or wall which lies between the intestines and abdominal cavity, or had been inclosed in another and larger piece of gauze, and that it had never been discovered or removed until on October 21st, when Dr. Mitchell, taking hold of the tape attached to it, had drawn it out.   It is claimed that to do this was negligence, was an unskillful, negligent and unprofessional act.   There is not a scintilla of evidence, even considering that of plaintiff herself, that sustains either of these ideas.   The idea that this sponge was inclosed in another and larger one, is a mere supposition, resting on no testimony whatever.   That it may have been

lodged outside of the wall or curtain of the intestines, describing the situation and not using technical terms, is not only unsupported, but is founded on disregard of natural laws.

Probably the best way to present the situation is to follow the explanation of the operation and of the internal structure of the abdomen as given by defendant; as to this latter he is uncontradicted, and supported in his statement of the operation by those present who saw it. He testified that after removing certain parts and matter from the abdomen, there was left a cavity larger than plaintiff's head, and she was a large woman; this cavity was separated from the intestines, the intestines walled off from it, by a wall of lymph, which Nature had thrown out—"a wall of lymph, which effectually separated the abscess cavity from the intestinal cavity. In other words, the intestines are contained in the abdominal cavity. This abscess had formed, lymph had been thrown out. Gradually the lower cavity had enlarged and had shoved the intestines up. There was a perfect wall, or seemed to be, between the abscess cavity and the intestines. After removing an ovary and other organs, and freeing the abdomen of the great mass of pus, defendant packed the cavity with sponges and gauze, stitched the edges of the cut, covered it with adhesive plaster, closed it, and wrapped a bandage around the body. The testimony of plaintiff is that she was unconscious when all this was done, but when she regained consciousness she found herself so bound up and when, on the ninth day, the dressing was removed, she saw the stitches taken out and the gauze removed and then replaced. She insists that she never saw any "sponge", such as produced, put in at any time. Therefore, according to her idea, it must have been put in at the first operation and when the cut and cavity were first treated and packed, and that is the only time "defendant closed the wound." Plaintiff says that she saw

the opening, the cavity, cleaned out until it was empty, so empty that she saw her own bowels. So she has shown that there was no sponge or gauze in sight in the wound or cavity. Then, and to meet this, his own client's testimony, the skillful counsel for plaintiff evolves the two ideas, call them theories, above given. That the first, a concealing of this sponge in a larger piece of gauze and accidentally leaving it in the wound or cavity, is untenable, is clear, even according to plaintiff's own testimony. She saw into the cavity and it was empty. That it had been pushed beyond the cavity, outside of the wall or curtain and became lodged in and was concealed by the fatty lining, wall or curtain, is supported by no testimony whatever and would be against the laws of Nature, the patient having survived. If it had been pushed or had penetrated through this wall, that it would have caused peritonitis and death, is the uncontradicted testimony of all the witnesses who were examined on this point. Defendant himself knew this. Asked if he had done anything toward preserving that wall, or if he had tried to break it down, he answered that he tried to use every care not to break it down; that if he had broken it down by shoving a sponge through, plaintiff probably would have died in a few hours of peritonitis; that the pus would have gone into the general peritoneal cavity and peritonitis and death would have followed. Defendant further testified that some twelve or fourteen days after the operation, he had personally taken out every vestige of gauze, irrespective of its form, whether in sponges or not, that was either on the abdomen or within the cavity, and cleaned out the abscess cavity thoroughly and repacked it with gauze sponges. That he did clean out this cavity is admitted by the plaintiff herself, for she says that she saw her own bowels. Of course, if this sponge was concealed by the fatty wall, as counsel contends, plaintiff could not

have seen it; but if that had been its position, says defendant, peritonitis and death would have followed.    So that on natural laws, it is impossible to hold that it could have been so concealed.    Describing the gauze sponges and that each had a tape, defendant testified that he had removed all of them, "not maybe or probably, but positively, no gauze which was in that abdomen could have been tangled up with anything;" knows he got all the packing out.    Of course, the jury were not bound to believe this testimony of defendant, but whether they believed it or not, plaintiff has not brought forward an iota of testimony from which the contrary can be inferred.    Her testimony, as we have seen, tends to confirm it.    She does not pretend to know what was put in when the wound was first dressed and closed; her idea is that this sponge was then put in and never removed until in October.    Her case must depend on establishing this proposition, for if this sponge was put in after May, after defendant had closed the wound, plaintiff's case falls.    The hypothetical question put by plaintiff rests on the presence of the sponge for 156 days, a period that can only be found by going back to May 28th, and even then until October 21st was but 143 days.    It was on the theory that this sponge had been there from May 28th to October 21st, that counsel for plaintiff also cross-examined the expert witnesses produced by defendant. In short, plaintiff's whole case as pleaded and as tried, rested on the fact that this sponge was placed in the cavity on May 28th, when "the defendant closed the wound."    There is not only an entire absence of proof of this, looking to the testimony of plaintiff herself, and she was the only witness on her side of the case who gave any testimony that can be held to bear on this point, but there is not a particle of evidence from which it can be inferred that it was negligent, unskillful or unprofessional to them close the wound with the sponge left in and that is the sole averment of negli-

gence. On the contrary, making the incision, filling the cavity and cut with gauze, with "sponges," and then closing the wound with them in place was the very thing to do, and the only proper treatment, and there is not a scintilla of evidence even tending to show that this was done carelessly or negligently. The burden was on plaintiff to prove that as the crucial fact in her case. She has failed in this.

It is hardly necessary to call attention to the fact that the petition has no reference to a natural closing of the wound; it refers to the closing of it by defendant. That it was not closed by Nature until long after plaintiff left the care of defendant, is proved by her own testimony.

Giving the most careful consideration of the evidence for plaintiff, giving her own testimony every possible weight, we are compelled to hold that there is no evidence in the case from which the jury had any right to infer that, even assuming that this sponge or piece of gauze was put in in May, that the wound was then carelessly, negligently and unprofessionally closed by the defendant. Nor is there any substantial evidence that any sponge then placed in the wound remained in it from then until the 21st of October. The most that can be said of plaintiff's testimony is that it shows that she did not know when this particular sponge was put in. Hence there is no substantial evidence that any of the gauze or sponges placed in the wound by defendant in May, remained until October, or that the gauze taken out in October had been put in on May 28th. That there was gauze or a surgical sponge in the wound when plaintiff left the care of defendant, is practically admitted ty defendant himself in a letter which he wrote and which is in evidence. But this is far from an admission that it had been there ever since May, nor is it any admission of respon-

sibility of defendant for its continuance in the wound until October.

Another phase of the case relates to the sponge having been left in the wound after plaintiff went from under the care of defendant and until its removal in October by Dr. Mitchell, her family physician. While there is no charge in the petition of negligence in leaving this sponge in the wound until October, the case was tried on the theory that it had been placed in the wound in May and left there until October, and that this was negligence for which defendant is responsible. Counsel for defendant, by his position at the trial, seems to have conceded that a question of negligence in leaving the sponge in, is in the case. It was tried on that theory, even though no such issue is tendered by the pleadings. But while conceding that this was in issue, that counsel insisted that defendant could only be charged for negligence in leaving the sponge in the wound down to the time plaintiff left the care of defendant. That was in August. Without passing upon this, we turn to the more important questions as to whether there is any causal connection between plaintiff's suffering and the presence of this sponge, and whether it was improper, careless and negligent, to leave it there when plaintiff left the hospital. The surgeon placed on the stand by plaintiff as an expert, positively refused to say that a sponge left in a wound of the character described, from May to October, would be responsible for the subsequent suffering or condition of the plaintiff. The most that he would say was that its effect would be problematical; that the proper length of time it should be left in would depend on conditions and the purpose for which it had been left in the wound; that they were often left in for several days. Asked if "several days" was the limit, he answered: "No, not the limit. As I said a while ago, it might be in some cases you would have some other object in keeping one certain

gauze in there, for instance if you are afraid to take it out on account of the position it is in, because you know you can't get it back there again, because you have got it in there for a purpose and you can't get another one back there, therefore your wound is suppurating anyway, it won't do any additional harm.''

Dr. Mitchell, who again took charge of the case after plaintiff returned from the hospital, testifies that the wound was then open, the opening about two and a half inches long and an inch and a half wide, and a "seropurulent secretion coming out of it," a discharge of pus. The wound remained open; as it would tend to heal up he destroyed the fine tissue formed at the outer edges with nitrate of silver in order to keep the wound open.

It appears from the testimony of Dr. Mitchell that on October 21st, when he removed the outer gauze, he found the tape of the sponge exposed and, taking hold of the tape with a pair of light steel tweezers, he pulled out the sponge. He testifies that when he found this sponge had been forced up toward the outer edge of the wound, he felt that the lower cavity was gradually healing and that this operation had forced the sponge to the surface. After taking out the sponge he put in a small drain, but the surface was healing so rapidly that it pushed this drain out and he had to use the nitrate to keep it open. Another abscess formed in a short time and the matter had worked itself through the original opening, discharging quite a large amount of pus. Again an abscess formed and the wound again reopened. This was some time after the sponge had been removed. This occurred several times until about February, when the wound healed.

So it is clear that from this evidence, and there was none to the contrary, the presence of the sponge had nothing to do with the formation of these abscesses, for Dr. Mitchell testifies that the suffering plaintiff went through was almost the same after the removal

of the sponge as before that.  Asked if, from his observation of the case, as he treated plaintiff from August 21st to October 21st, when he removed the sponge, in his opinion the presence of the sponge had been beneficial or detrimental, he answered that it was beneficial, "because, if the sponge hadn't been in her it would have then healed up; I couldn't have kept it open."  Asked if he had known that the sponge was in the wound when he took charge of plaintiff, whether he would have removed it, he answered that he would not.

It will be seen that the expert called by plaintiff refused to testify that the presence of the sponge was hurtful or leaving it there showed negligence.  In fact there was no evidence whatever, no witness testified that the presence of the sponge had been injurious.

For these reasons we are compelled to hold that the judgment of the circuit court in overruling the demurrers was erroneous.

In this view of the case we do not consider it necessary to take up other assignments further than we have done.  The judgment of the circuit court is reversed. *Allen, J.,* concurs.  *Nortoni, J.,* dissents.